FILED
11/14/2023 4:08 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L011612
Calendar, A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SHANNON O'BRIEN, )
)
              Plaintiff, )
) No.: 2023L011612
v. )
)
FRONTIER AIRLINES, INC., d/b/a )
FRONTIER AIRLINES, )
)
             Defendants. )
)

## COMPLAINT AT LAW

NOW COMES the Plaintiff, SHANNON O'BRIEN, by and through their attorneys, SALVI, SCHOSTOK & PRITCHARD, P.C., and complaining of Defendant, FRONTIER AIRLINES, INC., d/b/a FRONTIER AIRLINES.

### PARTIES, JURIDICTION AND VENUE

1. At all times relevant hereto, SHANNON O'BRIEN (hereinafter SHANNON), was an individual residing in Cook County, Illinois.

2. At all times relevant hereto, Defendant FRONTIER AIRLINES, INC., d/b/a FRONTIER AIRLINES (hereinafter "FRONTIER AIRLINES") was a Colorado corporation.

3. FRONTIER regularly conducts business in Cook County and owns and operates airplanes which fly throughout the United States and internationally, including Chicago O'Hare International Airport and Midway International Airport.

### FACTS COMMON TO ALL COUNTS

4. Spinal muscular atrophy (SMA) is a neurodegenerative disease that strikes the motor nerve cells in the spinal cords and affects the voluntary muscle movement used for activities

1

EXHIBIT A

such as walking, breathing, eating and crawling.

5. SMA is a progressive disease that causes nerves to atrophy – weaken and shrink – due to inactivity. This atrophy leaves patients with a restricted ability to move and perform basic physical movements and locomotion. The severity of SMA in any one person is highly individualized.

6. SMA does not impact sensory nerves or the intellect of patients. SMA does not affect a person's ability to think, learn, and build relationships with others.

7. SMA is diagnosed in approximately 1 in every 11,000 births in the United States; 1 in every 50 Americans is a genetic carrier. The effects of SMA do not discriminate, as SMA can affect any race or gender.

8. Individuals with SMA must often travel by air to attend work meetings, participate in clinical trials, or for leisure. To do so however, an individual with SMA must surrender their custom mechanized wheelchair – their only means of independent mobility – at the gate before they board a commercial aircraft. The wheelchair is then loaded into the plane's cargo space with all checked luggage.

9. The mechanized wheelchairs used by persons with SMA and others are customized for the unique needs and size of the person using them. They typically cost tens of thousands of dollars and are difficult to repair or replace.

10. Once an individual surrenders their mechanized wheelchair to board a plane, they are typically forced to wait as everyone else boards the aircraft. The individual is then wheeled into the aircraft in a manual wheelchair which has none of the head support, lateral body support, cushioning, or other assistive devices such as breathing apparatus that many individuals with SMA require.

11. Once on board an aircraft, there are no accessible lavatories for use. Those who have SMA or other neuromuscular diseases must sit on a regular cushion without lateral restraints for the entire flight and must sit next to someone who will hold them up during takeoff, turbulence and landing.

12. Upon arrival at the destination, a person with SMA then waits for the entire aircraft to deplane before they are again transferred to another ill-fitting and very uncomfortable manual wheelchair to wait in the terminal for their custom mechanized wheelchair to arrive. When it does, the mechanized wheelchair is often damaged and in many cases, is lost or misplaced.

13. Because these custom wheelchairs are treated like common luggage by commercial air carriers, they are subject to the same indiscriminate loss and damage that luggage is. According to the U.S. Department of Transportation, airlines on average damaged or destroyed 35 wheelchairs every single day during the month of May.

14. The experience of commercial flight for a person with SMA – or any individual who relies upon a mechanized wheelchair – can often range from humiliating and dehumanizing to painful. In cases where a custom mechanized wheelchair is lost or stolen, the affected individual is completely robbed of mobility and freedom in a manner that impacts all aspects of their ability to independently live and work.

15. This experience has been visited upon countless individuals with SMA and others who rely upon mechanized wheelchairs. Media accounts of individuals who have suffered as a result of gross carelessness are well-known throughout the airline industry.[1]

---

[1]
https://www.youtube.com/watch?v=F1ba5i34r-o
https://abcnews.go.com/US/2-travelers-wheelchairs-lost-same-united-airlines-flight/story?id=96780502
https://www.usatoday.com/story/travel/airline-news/2023/08/05/american-airlines-damaged-wheelchair/70519401007/
https://www.travelweekly.com/Travel-News/Airline-News/Poor-handling-wheelchairs-continues-plague-airlines
https://www.washingtonpost.com/travel/2021/06/07/wheelchair-scooter-damage-airplane-flights/

16. Plaintiff SHANNON O'BRIEN is the Vice President of Community Support at Cure SMA, an organization that provides advocacy, support and research on behalf of individuals diagnosed with Spinal Muscular Atrophy (SMA).[2] SHANNON is also an individual with SMA.

17. SHANNON leads a busy life, both personally and professionally, and is highly self-sufficient. In her capacity at CURE SMA, she frequently travels throughout the United States to advocate and support people with SMA.

18. Because SHANNON has SMA, she is unable to walk or hold her head and upper body straight while in a seated position. To meet her most basic needs at work and at home, SHANNON relies upon a highly customized mechanized wheelchair that holds her upper body and head in place and allows SHANNON to move freely, drive, go to work and engage in the activities of her daily life. As is the experience with most individuals with SMA, SHANNON's wheelchair provides her with independence that would otherwise not be possible.

19. SHANNON is fully dependent on her custom power wheelchair as her *de facto* "legs" to get her around and to keep her comfortable throughout the day. The only times in her life that SHANNON is not in her wheelchair is when she is sleeping, showering, or on an airplane traveling.

20. SHANNON is always in her wheelchair and is unable go anywhere that is not accessible, as she is extremely uncomfortable and unsafe when not properly supported by her

---

https://www.freep.com/story/news/local/michigan/wayne/2023/05/09/spirit-airlines-loses-ypsilanti-mans-wheelchair-goes-viral-on-reddit/70195568007/
https://globalnews.ca/news/9417590/air-canada-lost-wheelchair-broken-replacement/
https://www.newsweek.com/customer-says-american-airlines-lost-wheelchair-stranded-hours-1744685
https://travelnoire.com/american-airlines-loses-passengers-22k-wheelchair
https://www.businessinsider.com/disability-activist-died-after-united-airlines-destroyed-30k-wheelchair-2021-11
https://www.nbcnewyork.com/news/local/nyc-woman-says-delta-airlines-lost-then-damaged-her-specialized-30000-wheelchair/3798335/

[2] This action is brought by the Plaintiff solely in her individual capacity only.

4

wheelchair and headrest.

21. Unless SHANNON is in her wheelchair, she is not able to safely eat due to positional swallowing issues. If her headrest gets moved even slightly, SHANNON gets tension headaches and neck pain due to contractures and muscle tightness.

22. Although SHANNON must necessarily travel by air for work and leisure, the experience of being on the plane without her wheelchair is extremely challenging. Because SHANNON cannot sit in a supported position on the flight due to muscle weakness, the lack of seating support causes intense tension headaches and muscle pain that persists after a flight.

23. SHANNON must dehydrate herself prior to a flight, as she has no way of using the bathroom in an airplane.

24. On November 26, 2022, and at all times relevant hereto, SHANNON was a passenger scheduled to fly on FRONTIER Flight 81 flying from Punta Cana International Airport to Chicago O'Hare International Airport (hereinafter "O'Hare") at 2:30pm. On November 26, 2022, SHANNON gate-checked her custom power wheelchair in Punta Cana around 3:45pm (2:45pm EST) to board Frontier Flight 81 direct from PUJ (Punta Cana) to ORD (Chicago O'Hare) with 28 other family members and friends to return home from a holiday vacation.

25. Upon takeoff, SHANNON's plane experienced a hydraulic mechanical malfunction and had to make an emergency landing in Orlando, Florida.

26. After making an emergency landing in Orlando around 7:15pm EST, SHANNON was kept on the plane for over an hour waiting for her own wheelchair to arrive.

27. After waiting for more than an hour, Frontier Airlines personnel failed to deliver her mechanized wheelchair. Frontier Airlines personnel then brought SHANNON off the plane in an unsafe manual transport wheelchair that had no lateral or head support, while other passengers

were taken to a baggage carousel for baggage reclaim. SHANNON was told she could retrieve her wheelchair at baggage claim.

28. SHANNON was then taken through customs and brought to a baggage carousel where we she told she would be able to retrieve her wheelchair and sent home on a new flight. When SHANNON arrived at baggage claim, however, her wheelchair was not there.

29. After waiting at baggage with other passengers for nearly two hours, Defendant FRONTIER AIRLINES announced that no bags would be removed from the plane and that they would arrive in Chicago the next day on another flight.

30. Prior to SHANNON arriving at the baggage area with the other passengers, one of the Frontier workers made an announcement at the baggage carousel to all of the passengers (which included many of her relatives) that because the passenger in the wheelchair had not deboarded the plane, all luggage retrieval was delayed. This statement was false and served no purpose other than to scapegoat SHANNON for the unfolding series of failures that occurred on the flight.

31. By the time SHANNON arrived at a security checkpoint, there were no TSA agents on duty. SHANNON then waited for another 30-60 minutes in pain from being in the manual transport wheelchair while TSA agents were located.

32. When SHANNON arrived at the new assigned gate, every restaurant and shop was closed and there were no vending machines available to obtain food or water.

33. Although there was a plane ready to depart at the new gate, the assigned flight crew had "timed out" due to the inordinate delays. During this time SHANNON was forced to sit, in increasing pain, in the manual transport chair with only a few pillows SHANNON had borrowed from other passengers to try and support her head for over ten hours.

34. When SHANNON's sister/caretaker protested these conditions and alerted Frontier staff of the pain and discomfort SHANNON was in, she was told by the gate agent that retrieval of SHANNON'S wheelchair was not a priority and would not be on board SHANNON's flight home.

35. This demoralizing comment prompted SHANNON to request a disability advocate who arrived as SHANNON was about to board the new flight. This individual claimed, falsely, that SHANNON'S mechanized wheelchair had actually been transferred to the cargo hold of the new plane and would arrive with her in Chicago.

36. Skeptical, SHANNON pressed the issue until the representative confirmed over her two-way radio that the cargo hold was completely empty for the new flight, that her chair was still on the original plane, and that it would not be removed until that Sunday. SHANNON was further assured by the representative that her wheelchair would be on the next Frontier flight Monday morning. SHANNON repeatedly explained how medically necessary her chair was for her safety, comfort and well-being to no avail.

37. After landing in Chicago Sunday late morning, SHANNON was driven home by being placed in the front seat of a regular car and taken home to wait in bed to hear whether her wheelchair made it on the flight. SHANNON never received the call and was unable to rouse a single Frontier worker to address the problem.

38. Eventually, SHANNON was told the wheelchair would arrive at Midway Airport, a much longer drive from her home in Des Plaines. Relying on this information, SHANNON went to Midway Airport with family members to retrieve her wheelchair as promised, only to learn upon her arrival that the wheelchair was still in Orlando and would not arrive until the next day.

39. As SHANNON'S ordeal with FRONTIER AIRLINES continued unabated, it was

only when SHANNON shared her story on social media and later in a television interview that Defendant FRONTIER AIRLINES finally arranged delivery of the wheelchair at O'Hare Airport.

40. The wheelchair arrived in a partially disassembled state and with damage to the footplate.

41. In total, SHANNON was without her wheelchair for approximately 53 hours. The inordinate delay and conscious disregard for SHANNON'S health and safety demonstrated by Defendant FRONTIER AIRLINES caused her continuous physical pain and emotional anguish.

42. Because SHANNON was unjustly deprived of her wheelchair, SHANNON missed an important appointment for a catheter change at a local hospital on Monday November 28th.

43. Because SHANNON was unable to get rescheduled for another three weeks, she experienced further pain, discomfort and an increase in bladder spasms.

## COUNT I – NEGLIGENCE

### *Negligence – Frontier Airlines*

1. Plaintiff adopts, re-alleges, and incorporates by reference paragraphs 1-43 of the Facts Common to All Counts as though fully set forth herein.

2. At all times relevant hereto, FRONTIER had a duty of care to ensure that SHANNON was not deprived of her wheelchair and thus, her mobility, beyond the time necessary for point-to-point travel.

3. At all times relevant hereto, FRONTIER had a duty of care to ensure that SHANNON was not unnecessarily subjected to pain, discomfort, emotional distress and inconvenience due to its careless handling of SHANNON's wheelchair.

4. At all times relevant, FRONTIER owed a duty to SHANNON and other disabled

8

passengers, to abide by the standard of care established by the Air Carrier Access Act (ACAA) and the Americans With Disabilities Act (ACA).

5. Notwithstanding the aforesaid duties, at the time and place aforesaid, FRONTIER was negligent and/or careless in one or more of the following respects:

    a. Failed to monitor and keep track of the subject wheelchair;

    b. Failed to timely locate and return the subject wheelchair;

    c. On numerous occasions, misinformed SHANNON as to the location of her wheelchair and its arrival time;

    d. Failed to comport with the standard of care established by the ACAA with respect to assisting disabled passengers; and

    e. Failed to provide for proper stowage of personal requirements related to individual's disability in violation of 14 C.F.R. 382.

6. As a direct and proximate result of one or more of the foregoing negligent and/or careless acts/or omissions, SHANNON experienced physical pain, protracted physical discomfort and emotional distress.

7. As a direct and proximate cause of one or more of the foregoing negligent and/or careless acts/or omissions, SHANNON was bed-ridden for two days and endured conscious suffering and emotional distress.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against FRONTIER, for a sum in excess of the jurisdictional minimum of the Law Division of the Circuit Court of Cook County, Illinois; award Plaintiff her costs; and grant any other such relief the court deems just.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully Submitted,

SALVI, SCHOSTOK & PRITCHARD, P.C.

By: /s/ *Lance D. Northcutt*
      One of the Attorneys for Plaintiff

Lance D. Northcutt (ARDC #6278144)
SALVI, SCHOSTOK & PRITCHARD P.C.
161 N. Clark St., Suite 4700
Chicago, IL 60601
Phone: (312) 372-1227
Fax: (312) 372-3720
lnorthcutt@salvilaw.com
Firm No. 34560